UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 10-10241-RGS

UNITED STATES OF AMERICA

v.

RYAN LAZAR

AMENDED MEMORANDUM AND ORDER
ON A REQUEST FOR AN ORDER OF RESTITUTION

March 23, 2011

STEARNS, D.J.

The following issue is before the court as a matter of first impression:

May restitution be ordered in circumstances in which the alleged victim, although not charged with a criminal offense, is nonetheless a knowing participant in the fraudulent obtaining of mortgage financing or would such an order "so adversely [reflect] on the public reputation of the judicial proceedings" as to be barred by considerations of public policy or statutory interpretation?

Feb. 8, 2011 Scheduling Order, quoting *United States v. Reifler*, 446 F.3d 65, 127 (2d Cir. 2006). As I will answer the latter part of the question "yes," I will decline to order restitution in this case.

## BACKGROUND

On February 7, 2011, pursuant to a plea agreement, defendant Ryan Lazar pled guilty to two counts of wire fraud based on the following facts. B.L. and R.L., the

"victims," are a married couple who owned a heavily-mortgaged home at 3 Juniper Street in Wareham, Massachusetts (3 Juniper Street). In 2005, the couple fell on hard times when R.L., who suffers from cancer, lost her job as a purchasing agent for Texas Instruments. At about the same time, her husband B.L. underwent a second round of open heart surgery. The couple attempted to refinance the mortgage on 3 Juniper Street, but were turned down because of their poor credit.[1]

Christiano Lima,[2] a colleague of Lazar's at Mortgage Options of America (MOA), advised the couple to seek out a "private investor" as an alternative to refinancing. Lima introduced B.L. and R.L. to Lazar, a branch manager and loan originator for MOA. Lazar and the couple came to an agreement: Lazar would purchase 3 Juniper Street from B.L. and R.L., but would permit the couple to remain in the home as rent-paying "tenants" for one year, after which he would sell them back the home. Lazar also agreed that he would assist the couple in improving their credit scores so that they could qualify for a mortgage to finance the repurchase.

B.L. and R.L. admit that they knew that Lazar would falsely represent to Argent

---

[1] The couple had by then fallen two months behind on their mortgage payments. They were also delinquent on student loans and medical bills.

[2] Christiano Lima received a $6,000 "commission" from Lazar for making the introduction. Lima is currently serving a nine-month sentence for his role in other illegal foreclosure rescue schemes.

2

Mortgage (Argent), the lender, that he intended to occupy 3 Juniper Street as his primary residence. They also admit that they knew that Lazar "was going to get some money out of the equity of the house." That, however, is the extent to which they admit knowledge of the fraudulent scheme.

During the closing, Lazar, B.L., and R.L. executed an Option Agreement that falsely stated that the couple would pay a non-refundable fee of $38,440.91 for an option to repurchase the property when the tenancy expired. The parties also signed a HUD-1 Settlement Statement that falsely stated that the couple had received $45,118.62 in cash proceeds from the sale.[3] The deed, the purchase and sale agreement, and the HUD-1 were submitted as a package to Argent, which then gave Lazar two mortgages on 3 Juniper Street in the amount of $38,371.32.[4] The government's suggestion that only Lazar, and not B.L. and R.L., made material

---

[3] B.L. and R.L.'s signatures on the HUD-1 certified the following: "I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction."

[4] There is no claim that either B.L. or R.L. is illiterate, mentally disabled, mentally ill, or otherwise incompetent to sign a legal document. In fact, the record would suggest that they read the documents attentively, complaining at one point that B.L.'s name had been mistakenly omitted from the deed executed at the closing. A competent person who signs a contract will be held to its terms whether or not he or she reads and understands its provisions. *See Spritz v. Lishner*, 355 Mass. 162, 164 (1969).

3

misrepresentations to Argent is simply not credible.[5]

For their role in the transaction, R.L. and B.L. received $6,400 in cash from the closing proceeds and a 1999 Ford Mercury Tracer (purchased by Lazar) valued at $3,600. For his role at the closing, Lazar netted $25,029.74. During the ensuing year, Lazar spent $3,577 to raise R.L.'s credit score by over 100 points so that she could qualify for a new mortgage when it came time to repurchase 3 Juniper Street.[6] With Lazar's help, R.L. secured two mortgages totaling $269,000, an amount $75,000 greater than the balance of the couple's original mortgage. R.L. and B.L. received $14,599.64 in cash and the deed to 3 Juniper Street at the second closing.

On February 7, 2011, the court sentenced Lazar to concurrent terms of probation on each count of the indictment, a $1000 fine, and a $300 special assessment, while reserving judgment on the contested issue of restitution. On February 8, 2011, the court asked the parties to file supplemental briefing on the propriety of an order of

---

[5] Relevant only to Lazar's criminal culpability, on August 1, 2005, he refinanced his personal residence at 35 Salisbury Street in Tiverton, Rhode Island, with Fieldstone Mortgage, receiving $74,311 in loan proceeds. In doing so, he did not disclose the mortgage loans that he had received from Argent on July 28, 2005. The Fieldstone loan has since been sold to HSBC. To date, Lazar is current on his payments to HSBC. Lazar also argues that Argent incurred no loss because its loans were paid in full at the second closing.

[6] Lazar was unable to rehabilitate B.L.'s credit to qualify him for a mortgage as well.

restitution. B.L. and R.L. were not indicted or charged for their role in the 3 Juniper Street transaction.

## DISCUSSION

The Mandatory Victims Restitution Act (MVRA) requires courts to order restitution to victims of certain crimes (including wire and bank fraud) who are harmed by a defendant's criminal conduct. Restitution must be ordered regardless of the defendant's present ability to pay. *See United States v. Cheal*, 389 F.3d 35, 53 (1st Cir. 2004). The MVRA defines a victim as:

> a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2). In criminal matters, restitution is intended to be "penal and not compensatory." *See United States v. Ziskind*, 471 F.3d 266, 270 (1st Cir. 2006) (citation omitted).

While exceptions to the MVRA are as rare as hen's teeth, the Second and Ninth Circuits have held that the ordering of restitution between or among coconspirators is "beyond the authority conferred by the MVRA" and contrary to public policy. *Reifler*, 446 F.3d at 127. In *Reifler*, the Second Circuit vacated a district court's restitution order in a securities fraud case in which coconspirators had "pumped" the value of a

stock before "dumping" it on unsuspecting investors. When the government submitted a list of victims to the court, the list inadvertently included some of the coconspirators and their nominees in the "pump and dump" scheme.[7] The Second Circuit held sua sponte that classifying coconspirators as "victims" entitled to restitution from their fellow perpetrators of the crime, while arguably supported by the literal language of the MVRA, amounted to a "fundamental error" that "adversely reflect[s] on the public reputation of the judicial proceedings." *Id.* at 127. "In other words, because a literal application of the plain text leads to absurd results, the plain text does not control." *United States v. Lazarenko*, 624 F.3d 1247, 1251 (9th Cir. 2010), citing *United States v. King*, 224 F.3d 736, 740 (9th Cir. 2001).

In applying the judicially created coconspirator exception to the MVRA, courts have conducted fact-specific inquiries into an alleged "victim's" willingness as a participant in the scheme and whether he or she shared the same criminal intent as the defendant from whom restitution is sought. In *United States v. Sanga*, 967 F.2d 1332 (9th Cir. 1992), the Ninth Circuit found restitution appropriate for a coconspirator who had willingly agreed to her own smuggling into the U.S. to work as a live-in maid, but

---

[7] Although the district court's order expressly "exclud[ed] coconspirators," it more broadly directed that "[r]estitution shall be paid to the victims of the offense identified in [the unredacted] Government Exhibit 3." June 23, 2003 Order, cited in *Reifler*, 446 F.3d at 125.

6

who was then virtually enslaved and raped by her trafficker when she attempted to free herself from his clutches. The court found a departure from the coconspirator exception warranted under the extreme facts of the case. "Any criminal complicity in the conspiracy which [the victim] might bear stopped at the point at which she became the object of, rather than a participant in the criminal goals of the conspirators." *Id.* at 1335.

In *Lazarenko*, on the other hand, the Ninth Circuit refused to make an exception where the "victim" was a major participant in a money laundering scheme hatched by his coconspirator, the Prime Minister of Ukraine. As the Court observed, the restitution seeker participated in the conspiracy "even though he knew that his own *past* 'victimization' was the basis of the laundered money," and unlike the victim in *Sanga*, he "profited greatly from the overall criminal enterprise. . . . In short, [the restitution seeker's] deep and willing complicity in the heart of the conspiracy, following his initial victimization, sharply distinguishes [his] case from *Sanga*." *Lazarenko*, 624 F.3d at 1252.

By way of contrast, in *United States v. Ojeikere*, 545 F.3d 220 (2d Cir. 2008), the victims were gulled into putting money into a scheme to repatriate a large sum of ill-gotten funds allegedly controlled by the defendant's Nigerian confederates. The Second Circuit rejected the defendant's argument that the victims' hands were too dirty

7

to claim restitution. "[U]nlike the coconspirators in *Reifler,* the victims here were *not* involved in the *offense of conviction,* which was a fraudulent scheme to obtain money from [the victims themselves]. Whatever illegal scheme the victims thought they were involved in, it was not a scheme to lose their *own* money, which they earned fairly (as far as we know), lost, and now want returned." *Id.* at 222-223.

While the coconspirator exception has not to my knowledge been addressed by the First Circuit, I am confident that the Court would be as uncomfortable as are the Second and Ninth Circuits in allowing a conspirator to claim restitution as a "victim" under the MVRA based solely on the fortuity of the government's charging decision. As Judge Parker observed in *United States v. Martinez,* 978 F. Supp. 1442, 1453 (D.N.M. 1997) (cited in *Ojeikere,* 545 F.3d at 223) ("It is intuitively obvious that Congress did not intend to have the federal judiciary take the lead in rewarding, through restitution orders, persons robbed of monies they had obtained by unlawful means, especially where as a matter of policy, federal courts generally would not award those monies were they sought in a civil action. This is especially true when the person who has benefitted has violated federal laws.") (footnote omitted).

That brings me to a consideration of the role of B.L. and R.L. in the mortgage financing fraud. Their culpability would seem to lie in the middle of the spectrum that separates the victim in *Sanga* from the blatantly criminal coconspirator in *Lazarenko.*

8

B.L. and R.L. admit that they knew that Lazar had falsely represented his intention to reside at 3 Juniper Street in order to obtain financing from Argent. They also knew that Lazar intended to profit (as did they) by taking a personal cut of the mortgage proceeds. They also had to have known that they had not left the original closing with $45,118.62 in sales proceeds, nor had they paid $38,440.91 for an option to repurchase 3 Juniper Street. They ratified these lies by signing the deed, the purchase and sale agreement, and the HUD-1, all of which were part of the closing package on which Argent relied.

B.L. and R.L. were not the instigators, or the main executors of the scheme, but their intent was *in pari materia* with that of Lazar. Under the law of conspiracy, they are not exonerated by their claim of imperfect knowledge of all of the details and workings of the scheme. *See United States v. Brandon*, 17 F.3d 409, 428 (1st Cir. 1994) ("The government . . . need not prove that each defendant knew all of the details and members, or participated in all of the objectives, of the conspiracy as long as it can show knowledge of the basic agreement."). While the court is not without sympathy, given the sad series of events that plunged B.L. and R.L. into dire economic distress, and while the court understands the impulse that led them to a desperate effort to rescue the only home they had ever owned from foreclosure, thousands of other homeowners have faced similar hardships without resorting to mortgage fraud.

For evident reasons of public policy, a federal court cannot be seen as engaging

9

in the shifting of criminal proceeds among or between coconspirators. Consequently, I hold that restitution may not be ordered under the MVRA to a conspirator who participates in a fraudulent scheme with the same criminal intent as his or her coconspirators, whether or not the conspirator is formally charged as a defendant.

ORDER

For the foregoing reasons, the government's request for an order of restitution to B.L. and R.L. in the amount of $75,000 is <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE